Joyce O'NEAL, as Administrator of the Estate of Elizabeth Reader, Ashley Reader, James Reader and Joyce O'Neal, as Guardian of Samantha Malinowski, Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and State Farm Fire and Casualty Company, Appellees.

No. 503, 2008.

Supreme Court of Delaware.

Submitted: May 21, 2009.
Decided: July 23, 2009.

Gary S. Nitsche (argued) and Michael B. Galbraith of Weik, Nitsche, Dougherty & Componovo, Wilmington, DE, for appellants.

David G. Culley (argued) and Julie H. Yeager of Tybout, Redfearn & Pell, Wilmington, DE, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

Joyce O'Neal, as Administrator of the Estate of Elizabeth Reader, appeals from a Superior Court order granting State Farm's motion for summary judgment. After drinking several beers and smoking crack cocaine, Reader embarked on a per-

sonal errand in a van owned by her employer and insured by State Farm. Around midnight on July 10, 2006, she pulled that van onto the shoulder of I–495. For reasons unknown, Reader then left the van, which then struck and killed her as she walked behind it. The trial judge determined as a matter of law that State Farm is not obligated to provide coverage under the van's omnibus insurance provision because, under the "minor deviation" rule, Reader's highly intoxicated state at the time of the incident constituted a "major deviation" from her permitted use. Although we conclude that the "minor deviation" rule controls, whether Reader's conduct substantially exceeded her permitted use is a question of fact for the jury. Therefore, we must **REVERSE and REMAND.**

### FACT AND PROCEDURAL BACKGROUND

Sandra Pitts employed Reader as an independent contractor. In connection with her two businesses (Just Inside Café and Hot Dawg Carts), Pitts owned several vehicles, including a 1997 Chevrolet Astro Van. After Reader lost the use of her personal vehicle in May or June of 2006, Pitts allowed Reader to use the van to drive to and from work.[1] Several witnesses stated in their depositions that Reader began to use the van for personal purposes and that Pitts knew of those personal uses. Reader's daughter contended that, as she understood the arrangement, Reader could use the van "to go to work, go to the grocery store, and to visit her children." Reader's son asserted that Pitts knew of at least one instance when Reader used the van to go to the beach. Other witnesses agreed that Pitts

allowed Reader to use the van for personal purposes.

In the afternoon of July 9, 2006, Reader's father evicted her from his house. Reader called Richard Cutler to ask to stay with him in his apartment. Reader then drove the van to Cutler's apartment, arriving at approximately 7 p.m. In addition to drinking several beers with Cutler, Reader smoked crack cocaine in a back room of Cutler's apartment. Around 11 p.m., Reader and Cutler left the apartment to retrieve some of Reader's belongings from her father's residence.

With Reader driving the van, they left Cutler's apartment. While driving below the speed limit and in the right lane, the van "did a sharp … hard pull." After regaining control, Reader pulled the van into the I–495 southbound shoulder. When the van stopped, Reader got out and walked behind the van. Realizing that the van was rolling backwards, Cutler got out of the van and ran around to the driver's side. He did not see Reader. Cutler struggled to get into the driver's seat because it was "all the way up." Squeezing only half of his body into the seat and with his left foot dragging on the road, he attempted to apply the brakes. Cutler, who was highly intoxicated with a .268 BAC at the time of the incident, admitted to the police and at trial that he "did not know if he hit the gas pedal or the brake pedal." The van traveled backwards about 15 to 20 feet before stopping. Although Cutler did not recall the van hitting anything, it had struck and killed Reader. Post mortem tests demonstrated that Reader had a .218 BAC and confirmed her recent marijuana and cocaine use.

---

1. Given that we view the facts "in the light most favorable to the nonmoving party[,]" we rely primarily on the facts proffered to the trial judge by O'Neal. *See Mason v. United Servs. Auto. Ass'n,* 697 A.2d 388, 392 (Del. 1997).

The State Farm policy covering the van contained an omnibus provision,[2] which provided:

Who is an Insured

When we refer to your car ... insured means:

1. you;

2. your spouse;

3. the relatives of the first person named in the declarations;

4. *any other person while using such a car if its use is within the scope of consent of you or your spouse;* and

5. any other person or organization liable for the use of such car by one of the above insureds.[3]

On September 21, 2006, O'Neal filed a Complaint for wrongful death against Richard Cutler in Superior Court. On March 16, 2007, State Farm filed a Complaint for Declaratory Judgment. On April 5, 2007, O'Neal filed a separate Complaint for no fault benefits against State Farm. The Superior Court consolidated those three cases.

The trial judge granted State Farm's motion for summary judgment because he concluded that Reader's intoxication constituted a "major deviation" from the scope of her permission to use the van. This appeal followed. After consideration by a panel of three justices, we requested supplemental memorandums and held *en Banc* oral argument.[4]

## DISCUSSION

### The "Minor Deviation" Rule Controls.

Generally, courts follow one of three distinct rules to determine whether a permittee's vehicle use falls outside of an insurance policy's omnibus clause's coverage.[5] Only a small minority of courts follow the "specific purpose" rule (also known as the "conversion" or "strict" rule), which dictates that even slight deviations from restrictions specified or intended by the parties will preclude coverage.[6] Neither party suggests that we should follow this strict rule.

O'Neal suggests that we follow the "initial permission" rule, under which "the grant of permission to use an automobile at all makes the omnibus clause applicable

2. The Delaware Financial Responsibility Law, 21 *Del. C.* § 2902, requires automobile liability insurance contracts to include an omnibus clause, which is a "provision ... that extends coverage to all drivers operating the insured vehicle with the owner's permission." Black's Law Dictionary 1116 (7th ed. 1999).

3. Emphasis added.

4. We instructed the parties to address the following:

(1) The parties apparently agree that this Court has never decided what rule or standard should be applied in construing an omnibus clause in an automobile insurance policy. Please address whether the "minor deviation" rule or any other rule should be adopted by this Court. In doing so, please explain the policies that would be advanced by the

rule; any statutory support for your position; and please identify whether it represents the majority view in other jurisdictions; and

(2) Assume that an insured lends his car to a friend, and that there are no restrictions on the friend's use of the car. Please discuss whether the fact that the friend may have used the car in a grossly negligent or reckless manner (either by excessive speeding; intoxication; or any other behavior) affects the coverage determination. If the answer depends upon the applicable rule concerning the scope of the friend's permission, please discuss the outcome of this hypothetical under each of the recognized rules.

5. 8 Couch on Insurance § 113:5 (3d ed. 2008).

6. *Id.* § 113:7.

to practically any subsequent use, even though the use is unauthorized, or completely unconnected to the use for which permission was given."[7] O'Neal relies on *Progressive Northern Ins. Co. v. Concord Gen. Mut. Ins. Co.*, which describes the "initial permission" rule as follows:

> Under the "initial permission" or, as some authorities have described it, the "hell or high water" rule, once permission to use an insured vehicle is given in the first instance, any subsequent deviation is wholly immaterial and will not defeat coverage under an omnibus clause. Coverage is defeated only where the deviation from the permitted use rises to the level of theft or conversion. This liberal approach is based upon the following policy considerations: (1) it effectively furthers the state's policy of compensating and protecting innocent accident victims from financial disaster, (2) the rule serves to discourage collusion between lender and lendee in order to escape liability, and (3) the rule greatly reduces a most costly type of litigation.[8]

O'Neal argues that the "initial permission" rule is most consistent with § 2902's goals and purposes because liberally construing omnibus clauses best effectuates the public policy underlying mandatory minimum coverage.

State Farm argues that we should follow the "minor deviation" rule, which some view as an intermediate position between the "specific purpose" and "initial permission" rules.[9] Under this rule, if the permittee's use is not "such a gross, substantial, or major violation, even though it may have amounted to a deviation, protection is still afforded to the [permittee] under the omnibus clause."[10] Where a major deviation occurs, "it is frequently said that the permission is no longer effective or is annulled, because it would be presumed that the original insured would not have given permission had the use for the deviation been requested."[11]

State Farm argues that the "minor deviation" rule appropriately allows trial judges flexibility in attempting to balance the interests of permittees, automobile owners, and insurers. State Farm relies on the Texas Supreme Court's following explanation allowing for judicial discretion:

> The primary reason the minor deviation rule is increasing in use in other jurisdictions is that each case is permitted to stand on its own facts. Some deviations would be so slight as to not raise a fact issue that the permission was revoked; other deviations of more significance would raise a fact issue for the factfinder; while still other deviations might be so gross as to destroy the initial permission as a matter of law.[12]

Noting that the Superior Court has followed the "minor deviation" rule since 1981,[13] State Farm argues that neither experience nor precedent support O'Neal's assertion that the "minor deviation" rule

---

7. *Id.* § 113:8.

8. 151 N.H. 649, 864 A.2d 368, 375 (2005) (quotations and citations omitted).

9. 8 Couch on Insurance § 113:11 (3d ed. 2008).

10. *Id.* § 113:11.

11. *Id.* § 113:12.

12. *Coronado v. Employers Nat. Ins. Co.*, 596 S.W.2d 502, 505–06 (Tex.1979) (denying om-

nibus coverage to an employee who was involved in an accident while driving a company owned vehicle on a purely personal mission after working hours and after stopping at two bars (all part of an "eight hour drinking spree")).

13. *See, e.g., American International Insurance Co. v. Farm Family Casualty Insurance Co.*, 1999 WL 1442000 (Del.Super.); *Harrold v. Aetna Casualty & Surety Co.*, 1991 WL 113314 (Del.Super.); *St. Paul Fire & Marine Insur-*

would "exclude coverage for driving while distracted, exceeding the speed limit, or running red lights."

■ We conclude that O'Neal's arguments are not persuasive and that the "minor deviation" rule controls our review. We agree with the Supreme Court of South Dakota's description of the "minor deviation" rule:

> This is the most reasonable approach to the permission problem in that it furthers the public policy of compensating victims, recognizes that permittees are engaged in various activities and may stray from the exact letter of their permission, and it attempts to be fair to the insurer in that it will not expose the insurer to all possible liability arising from use of the vehicle with the initial permission of the insured.[14]

Unlike the "initial permission" rule, the "minor deviation" rule effectively balances those competing public policies. As noted by State Farm, the "initial permission" rule provides coverage for even "ludicrous" uses *(e.g.,* drag racing), so long as those uses do not constitute theft or conversion. Although there is a strong public policy for compensating innocent victims, adopting the "initial permission" rule would create potentially limitless liability for insurers. Inevitably, those insurers would raise their premiums to account for this increased risk.

■ Here, the trial judge applied a two step "minor deviation" analysis. He described that analysis as follows:

First, the Court must determine the extent of the permission granted, paying "particular attention to the relationship of the parties and the scope of the initial permission." "Permission will usually be given a broader scope in a family situation than in an employer-employee situation," and "[o]rdinarily implied permission to an employee to use his employer's vehicle extends only to its use within the scope of the employment, and permission to use the automobile for a given purpose does not imply permission to use it for other purposes."

Next, the Court must look to the specific facts of the alleged deviation to determine whether the deviation was "minor" or "major" in relation to the permission given. Relevant factors include the distance and time of the deviation, and whether the deviation "is one which could have been reasonably contemplated or foreseen, or whether the deviation is alien or foreign to the original permitted objective or operation."[15]

Consistent with the trial judge's analysis, we conclude that the factors essential to determining whether a permittee's use exceeded his initial permission are simply those Five Ws (and one H) that are widely held as the basic tools of information gathering: Who, What, When, Where, Why, and How.[16]

■ To determine the scope of the asserted permission, we must consider the

ance Company v. West American Insurance Company, 437 A.2d 165 (Del.Super.1981).

**14.** *State Farm Mut. Auto. Ins. Co. v. Ragatz,* 571 N.W.2d 155, 160 (S.D.1997) (citations omitted).

**15.** *State Farm Mut. Auto. Ins. Co. v. O'Neal,* 2008 WL 4194006, at *3–4 (Del.Super.) (citations omitted).

**16.** Rudyard Kipling memorialized these six basic questions in *The Elephant's Child,* as part of his *Just So Stories* first published in 1902. This short story provides a whimsical account of how the elephant's trunk became so long and it contains a poem that begins:

> I keep six honest serving-men
> (They taught me all I knew);
> Their names are What and Why and When
> And How and Where and Who.

questions *who, what,* and *why.* We must look at *who* is the alleged permittee and determine whether he is someone with explicit or implicit permission to use the vehicle. For the reasons outlined by the trial judge, in addressing this *who* factor, we must also determine the alleged permittee's relationship to the vehicle owner. Next, we look at *what* vehicle the alleged permittee is allowed to use because owners of multiple vehicles may extend permission to use only certain vehicles. When considering *why,* we must determine for which purposes the vehicle owner explicitly or implicitly granted permission—*e.g.,* may the permittee use the vehicle solely for work related purposes or may he also use it for personal purposes.

▮ After determining the scope of the permission, we next consider whether the permittee exceeded that permission, by asking the questions *where, when,* and *how.* We look at *where* the permittee used the vehicle and consider his route's relationship to his permitted purposes. Similarly, we consider *when* the permittee used the vehicle because his permission may be limited, for example, by time of day or by day of the week. Finally, we consider *how* the permittee used the vehicle—*i.e.,* whether the permittee obeyed the pertinent traffic laws and, otherwise, operated the vehicle in a reasonable manner. One specific consideration is whether the permittee used the vehicle while intoxicated or otherwise impaired.

▮ We consider all of the above factors, on a case by case basis, and determine whether the alleged deviation was "minor" or "major." While the trial judge considered it merely an element of his analysis, we believe it is of paramount importance whether the alleged deviation "is one which could have been reasonably contemplated or foreseen, or whether the deviation is alien or foreign to the original permitted objective or operation." [17]

### Questions of Fact Remain Regarding Reader's Permission and Use

▮ Applying the above analysis and viewing the facts in the light most favorable to O'Neal, we conclude that genuine issues concerning the material facts at issue remain and that the trial judge erred by granting summary judgment to State Farm. Specifically, we conclude that material factual disputes remain concerning both the scope of Reader's initial permission and her alleged deviation.

The record reflects that Pitts' son ran the catering business until he relocated to Texas in the summer of 2005. When Pitts took over, the two related businesses had no employees and a few used vans. In August 2005, Pitts asked Melissa Wilson, who had been cleaning Pitts' house, whether she would like to work for the catering business instead. Wilson agreed; her hours fluctuated, and she was paid as an independent contractor to save taxes. Wilson did not have a car when she started working for Pitts, so Pitts suggested that Wilson buy one of her vans. According to Wilson, Pitts took a small amount out of her weekly check to pay for the van.

Reader also had been cleaning houses when one of Pitts' friends introduced her to Pitts. Reader started working for the catering businesses, on an as needed basis, in November 2005. There is at least some evidence that Reader, also, was buying one of Pitts' vans. But the van Reader was buying (or had already bought) broke down, so Reader was driving *another* of Pitts' vans at the time of the accident. Wilson testified that Reader used the van for all purposes and that Pitts was well

---

**17.** *O'Neal,* 2008 WL 4194006, at *4 (quoting *American International Insurance Company v.* *Farm Family Cas. Ins. Co.,* 1999 WL 1442000, at *5 (Del.Super.)).

aware of that fact. Wilson also testified that Reader did not have a license and that Pitts knew that fact as well.

Viewing these facts in the light most favorable to Reader, we find material facts disputed about the original scope of permission. Whether Reader was purchasing a van from Pitts may affect the context in which Pitts allowed Reader to use the van involved in the accident. If Reader was purchasing or had purchased a van and that van was not working, it is reasonable to infer that Pitts would have allowed Reader to use that second van as if it were her own. Therefore, questions remain regarding *what* vehicle(s) Pitts permitted Reader to use and *why* Pitts gave that permission.

■ Turning to the accident, we also find material fact questions remain concerning *how* Reader used the van on the night of the accident. As State Farm acknowledges, where a driver receives *unrestricted* permission to use a vehicle, no court has held that intoxication, *alone*, vitiates permission as a matter of law.[18] We decline to be the first. Instead, we consider a permittee's level of intoxication as merely a single, nondeterminative element in analyzing *where*, *when*, and *how* that permittee used the vehicle.[19]

■ Although it is clear that Reader operated the van while highly intoxicated, there is evidence that she operated the vehicle in an otherwise reasonable manner. She was not speeding, and she did not lose control of the van. After the van unexpectedly "pulled hard," she successfully brought the van to a complete stop in the highway shoulder. Reader did make the mistake of leaving the van's engine running when she got out of the van, but the evidence suggests that even that mistake might not have been consequential. It is possible that, but for Cutler's actions, the accident would not have occurred.

For these reasons, we conclude that the record evidence does not support the trial judge's determination that, *as a matter of law*, Reader's use constituted a "major deviation." Because we agree with the trial judge's conclusion that O'Neal's claim for PIP benefits also turns on whether Reader exceeded the scope of her permission,[20] we reverse his grant of summary judgment in relation to both O'Neal's claims under the omnibus clause and for PIP benefits.

## CONCLUSION

For the above reasons, the Superior Court's judgment is **REVERSED and REMANDED.**

---

**18.** *See generally, e.g., Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156 (5th Cir. 2006); *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460 (5th Cir.2005); *Cincinnati Ins. Co. v. Reither*, 1993 WL 372223 (Ohio Ct. App.); *Allstate Ins. Co. v. Porter*, 1992 WL 185669 (Ohio Ct.App.); *Nat'l Indem. Co. v. N. American Indem.*, 1991 WL 263707 (Ariz. App.); *United Fire & Cas. Co. v. Tharp*, 46 S.W.3d 99 (Mo.Ct.App.2001).

**19.** Citing *Coronado v. Employers Nat. Ins. Co.*, State Farms asserts that an *employee's* intoxication, alone, destroys permission. The *Coronado* court, however, considered not only the

unreasonableness of the permittee's intoxication but also those additional factors of time, place and purpose. *See* 596 S.W.2d at 505. That court reached its conclusion, based on the fact that the deviation at issue was "an eight hour drinking spree *wholly unrelated by time, place, or purpose from the objectives for which he was granted use of the vehicle." Id.*

**20.** *See generally Harris v. Nationwide Mutual Ins. Co.*, 712 A.2d 470 (Del.Super.1997), *aff'd by Harris v. Nationwide Mutual Ins. Co.*, 1997 WL 664686 (Del.).